1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
  *dalekgalipo@yahoo.com*
Marcel F. Sincich, Esq (SBN 319508)
  *msincich@galipolaw.com*
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

MARY STARKS, individually and as successor in interest to Decedent RICKIE STARKS

Plaintiff,

v.

COUNTY OF LOS ANGELES; SHERIFF ALEX VILLANUEVA; EDWIN BARAJAS; TAYLOR INGERSOLL; and DOES 1-10, inclusive,

Defendants.

CASE No.: 2:21-cv-05209

[*Honorable* _____]

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

1. Fourth Amendment—Excessive Force (42 U.S.C. § 1983)
2. Fourth Amendment—Denial of Medical Care (42 U.S.C. § 1983)
3. Fourteenth Amendment—Interference with Familial Relations (42 U.S.C. § 1983)
4. Municipal Liability—Inadequate Training (42 U.S.C. § 1983)
5. Municipal Liability—Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983)
6. Municipal Liability—Ratification (42 U.S.C. § 1983)

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES

COME NOW, Plaintiff MARY STARKS, individually and as successor in interest to Rickie Starks, her son, for her Complaint against COUNTY OF LOS ANGELES; SHERIFF ALEX VILLANUEVA; DEPUTIES EDWIN BARAJAS and TAYLOR INGERSOLL; and DOES 1-10, inclusive and hereby alleges as follows:

## INTRODUCTION

1.     This civil rights action seeks compensatory and punitive damages from Defendants for violating various rights in connection with the shooting death of RICKIE STARKS ("DECEDENT") on July 3, 2019.  The Defendants are liable under the Constitution of the United States pursuant to the Fourth and Fourteenth Amendments brought under 42 U.S.C. § 1983.

2.     Defendants EDWIN BARAJAS; TAYLOR INGERSOLL; and DOES 1-7, inclusive, ("DEFENDANT DEPUTIES") caused various injuries by intentionally shooting DECEDENT who was unarmed and not an immediate threat of death or serious bodily injury as described herein, including by integrally participating or failing to intervene in the incident, and by engaging in other acts and/ or omissions around the time of the incident.

3.     Defendants SHERIFF ALEX VILLANUEVA and DOES 8-10, inclusive, ("DEFENDANT SUPERVISORS") caused various deprivations of PLAINTIFF'S and DECEDENT'S rights as described herein, including by integrally participating or failing to intervene in making the deliberate choice of action made from among various alternatives by said official(s) responsible for establishing final or official policies, practices or customs for the Defendant COUNTY.

4.     This action is in the public interest as PLAINTIFF seeks by means of this action to hold accountable those responsible for the shooting, serious bodily injury, and death of her son, DECEDENT, inflicted by DEFENDANTS.

5.     This case involves the shooting death of DECEDENT by DEFENDANTS BARAJAS and BARAJAS, without a legitimate law enforcement objective or justification, when DEFENDANTS intentionally shot DECEDENT while in a condensed, residential neighborhood, and by failing to provide and failing to call for medical aid for DECEDENT, acting pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the Defendant COUNTY.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## THE PARTIES

8.     At all relevant times, RICKIE STARKS ("DECEDENT") was an individual residing in the County of Los Angeles, California.

9.     Plaintiff MARY STARKS ("PLAINTIFF") was an individual residing in County of Los Angeles, California, and is the natural mother of DECEDENT.  PLAINTIFF sues both in her individual capacity as the mother of DECEDENT, and in a representative capacity as a successor-in-interests to

DECEDENT pursuant to California Code of Civil Procedure § 377.60. PLAINTIFF seeks survival and wrongful death damages.

10. As PLAINTIFF is ninety-three (93) years old at the time of filing this action, should PLAINTIFF not survive the resolution of the action, DECEDENT'S surviving natural siblings will become his successors-in-interest as well as PLAINTIFF'S successors-in-interest pursuant to California Code of Civil Procedure § 377.60. DECEDENT'S surviving siblings are, WAYMON STARKS, an individual residing in the County of Los Angeles, California; WENDELL WILLIAMS an individual residing in the Las Vegas, Nevada; and MICHAEL STARKS an individual residing in the Las Vegas, Nevada.

11. Defendant COUNTY OF LOS ANGELES ("COUNTY") is and was a duly organized public entity, form unknown, existing under the laws of the State of California. COUNTY is a chartered political subdivision of the State of California that is within this judicial district with the capacity to be sued. COUNTY is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the County of Los Angeles Sheriff's Department. At all relevant times, Defendant COUNTY was responsible for assuring that actions, omissions, policies, procedures, practices, and customs of the County of Los Angeles Sheriff's Department and its employees and agents complied with the laws of the United States and the State of California. At all relevant times, COUNTY was the employer of Defendants DOES 1-10, inclusive.

12. Defendant SHERIFF ALEX VILLANUEVA ("VILLANUEVA") is the Sheriff working for the County of Los Angeles Sheriff's Department. At all relevant times, VILLANUEVA was acting under color of law within the course and scope of his duties as Sheriff working for the County of Los

Angeles Sheriff's Department.  At all relevant times, VILLANUEVA was acting with the complete authority and ratification of his principal, COUNTY OF LOS ANGELES.

13.   Defendant EDWIN BARAJAS ("BARAJAS") is a deputy working for the County of Los Angeles Sheriff's Department.  At all relevant times, BARAJAS was acting under color of law within the course and scope of his duties as a deputy working for the County of Los Angeles Sheriff's Department.  At all relevant times, BARAJAS was acting with the complete authority and ratification of his principal, COUNTY OF LOS ANGELES.

14.   Defendant TAYLOR INGERSOLL ("INGERSOLL") is a deputy working for the County of Los Angeles Sheriff's Department.  At all relevant times, INGERSOLL was acting under color of law within the course and scope of his duties as a deputy working for the County of Los Angeles Sheriff's Department.  At all relevant times, INGERSOLL was acting with the complete authority and ratification of his principal, COUNTY OF LOS ANGELES.

15.   Defendants DOES 1-7, inclusive ("DOE DEPUTIES"), are Sheriff's Deputies for the County of Los Angeles Sheriff's Department.  At all relevant times, these Defendants were acting under color of law within the course and scope of their duties as County of Los Angeles Sheriff's Department Deputies and at other times they were working in their personal capacity as individuals outside the scope of their employment.  At all relevant times, DOES 1-7, inclusive, were acting with the complete authority and ratification of their principal, COUNTY.

16.   Defendants DOES 8-10, inclusive ("DOE SUPERVISORS"), are managerial, supervisorial, or policymaking employees of the County of Los Angeles Sheriff's Department who were acting under color of law within the course and scope of their duties as supervisorial officers for the County of Los

Angeles Sheriff's Department.  DOES 8-10, inclusive, were acting with the complete authority of their principal, COUNTY.

17.    PLAINTIFF is ignorant of the true names and capacities of DEFENDANTS DOES 1-10, inclusive, and therefore sues these defendants by such fictitious names.  PLAINTIFF will amend the complaint to allege the true names and capacities of those defendants when the same has been ascertained. PLAINTIFF is informed believes, and on that basis alleges, that DOES 1-10, inclusive, and each of them, are responsible in some manner for the occurrences alleged herein and proximately caused PLAINTIFF'S damages.

18.    On information and belief, DOES 1-10, inclusive, were at all relevant times residents of the County of Los Angeles.

19.    PLAINTIFF is informed and believes, and on that basis alleges, that DEFENDANTS acted at all times mentioned herein as the actual and/or ostensible agents, employees, servants or representatives of each other and, in doing the activities alleged herein, acted within the scope of their authority as agents and employees, and with the permission and consent of each other.  At all times mentioned herein, each and every DEFENDANT had the legal duty to oversee and supervise the hiring, conduct, and employment of each and every DEFENDANT.

20.    At all relevant times mentioned herein, the acts and omissions of all DEFENDANTS were pursuant to the actual customs, practices, policies and/or procedures of the COUNTY.

21.    PLAINTIFF is informed and believes, and on that basis alleges, that at all times mentioned herein all Defendants acted under color of law, statute, ordinance, regulations, customs and usages of the State of California and COUNTY.

22.    All DEFENDANTS who are natural persons, including DOES 1-10, inclusive, are sued individually and/or in his/her capacity as officers, deputies, investigators, sergeants, captains, commanders, supervisors, and/ or civilian employees, agents, policy makers, and representatives of the County of Los Angeles Sheriff's Department.  Moreover, DEFENDANTS and their agents ratified all of the acts complained of herein.

23.    Defendants VILLANUEVA, BARAJAS, INGERSOLL, and DOES 1-10, inclusive, are sued in their individual capacity, and punitive damages are only being requested as to these Defendants, and not COUNTY.

## FACTS COMMON TO ALL CAUSES OF ACTION

24.    PLAINTIFF repeats and re-alleges each and every allegation of paragraphs 1 through 23, inclusive, as if fully set forth herein.

25.    PLAINTIFF sustained injuries, including but not limited to funeral and burial expenses, loss of financial support, loss of gifts or benefits, loss of household services, loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training and guidance from the wrongful death of her son, DECEDENT.

26.    DECEDENT sustained harm, injuries, pre-death pain and suffering, loss of life, and loss of enjoyment of life.

27.    PLAINTIFF and DECEDENT suffered the above mentioned damages when COUNTY Deputies BARAJAS and INGERSOLL intentionally shot DECEDENT and failed to provide or call for medical aid.

28.    DEFENDANTS BARAJAS and INGERSOLL were on-duty employees of the COUNTY, each of whom was acting under color of law and as an employee or agent of the COUNTY, and within the course and scope of their employment with COUNTY.

29.   DEFENDANTS BARAJAS and INGERSOLL acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the Defendant COUNTY.

30.   On July 3, 2019, at or around 11:30 PM, DEFENDANTS BARAJAS and INGERSOLL, working for the Los Angeles Sheriff's Department ("LASD") and the County of Los Angeles, attempted to make a traffic stop of a black Cadillac Escalade, at or around the area of Rosecrans Avenue and North Oleander Avenue.  BARAJAS was the driver of the patrol vehicle and INGERSOLL was the bookman and radio communicator.  At the time, the DEFENDANT DEPUTIES were transporting a civilian that was sitting in the back of the patrol vehicle.

31.   Upon information and belief, DEFENDANTS BARAJAS and INGERSOLL actions and inaction alleged herein were, in part, in order to become members of the Los Angeles Sheriffs' Department Compton Station Deputy Gang called the "EXECUTIONERS."

32.   Upon in information and belief, the attempted traffic stop resulted in a vehicle pursuit.  The route of the relevant portion of the vehicle pursuit of the Escalade was east on Rosecrans Avenue ("Rosecrans") into the residential neighborhood, south on North Oleander Avenue ("Oleander"), west on West Spruce Street ("Spruce"), and north on North Aranbe Avenue ("Aranbe").  This location includes small residential streets, several single-family homes, and an adjoining elementary school.

33.   At this relevant portion of the vehicle pursuit, the sixty-five (65) year old African American DECEDENT was merely riding his bicycle home travelling south on Aranbe towards Spruce.

34.   DEFENDANTS BARAJAS and INGERSOLL closed the distance on the Escalade while on Spruce.  Then, when the pursuit reached the corner

of Spruce and Aranbe, DEFENDANTS BARAJAS and INGERSOLL'S patrol vehicle slowed to a stop when they observed DECEDENT in the area of a parked vehicle, as the Escalade continued north on Aranbe Avenue.

35.     At or around the time that the patrol vehicle came to a stop at the corner of Spruce and Aranbe, DEFENDANTS BARAJAS and INGERSOLL intentionally fired their weapons at DECEDENT through the lower right side of the front windshield and the right passenger window of the patrol vehicle attempting to strike DECEDENT center mass.

36.     DECEDENT was shot by one bullet and died on Aranbe just north of the Spruce and Aranbe intersection, which is to the north and east of the DEFENDANTS position at the time.

37.     The trajectory of the bullet that struck DECEDENT was south to north.  DECEDENT was shot center-mass in the torso, with a right to left, front to back, and upward trajectory.

38.     The entrance wound of the fatal bullet that struct DECEDENT was located on his abdomen, in the left upper abdominal quadrant.  The entrance wound exhibits the well-established and classic configurations of an entrance wound vis: a small oval to circular perforating wound with loss of tissue and with a rim of circumferential marginal abrasions, accompanied by secondary juxta-posed external ricochet abrasions.

39.     The exit wound of the fatal bullet that struck DECEDENT was located on his left lateral chest.  The exit wound exhibited an irregular and gaping laceration with apposable margins without any rim or circumferential marginal abrasions.

40.     Upon in information and belief, DECEDENT was near a parked vehicle on the east side of Aranbe with the right side of his body towards the patrol vehicle and the left side of his body towards the Escalade when he was

intentionally shot by DEFENDANTS and killed.   DECEDENT was found lying face-down on the north lane of Aranbe next to his bicycle, with this head oriented north-northeast.

41.   The gunshot wound killing DECEDENT was fired from a 9-mm caliber weapon that suffered and external ricochet and developed a high yaw before striking DECEDENT'S body.  The ricochet of an intermediary external object or surface such as glass and/or the ground trajected material on DECEDENT'S skin, which caused classic external ricochet-abrasions of the skin of the left upper abdominal quadrant juxta-posed to the gunshot entrance wound and aligned along the trajectory of the bullet.

42.   After intentionally shooting DECEDENT, DEFENDANTS BARAJAS and INGERSOLL transmitted "998" over the radio to communicate that an officer-involved shooting occurred, then drove past DECEDENT'S body and did not call for medical attention.

43.   DECEDENT needed timely life-saving medical attention but bled to death as a result of DEFENDANTS BARAJAS and INGERSOLL failing to stop and provide medical care and failing to alert dispatch of a man down.

44.   DEFENDANTS BARAJAS and INGERSOLL intentionally fired their weapons at DECEDENT, striking and causing DECEDENT to be killed.

45.   The deadly force used during the incident was excessive and unreasonable because DECEDENT was unarmed, was not an immediate threat of death or serious bodily injury to anyone, was not a threat at all to anyone, was not resisting arrest or attempting to evade arrest by flight, no warning was given by the DEFENDANTS, DEFENDANTS had other reasonable alternatives to the use of deadly force against DECEDENT, DECEDENT had not committed any crime, and DECEDENT was not a suspect in the pursuit or any other crime.

CASE No.: 2:21-cv-05209

46.     Upon information and belief, the EXECUTIONERS is a violent deputy gang involved in criminal activity, similar other deputy gangs such as the "Bandidos" operating out of East Los Angeles.

47.     Upon information and belief, deputy members of the EXECUTIONERS use violence and unreasonable force against members of the public, as well as falsifying reports, and create illegal arrest quotas violating the civil rights of hundreds of citizens of Compton.

48.     Upon information and belief, the EXECUTIONERS recruit members from Compton Station based upon the deputy's use of violence against citizens of Compton.

49.     Upon information and belief, the vast majority of Compton deputies who have been involved in high-profile shootings and out-of-policy beatings at Compton Station in recent years have been by "inked" members of the EXECUTIONERS or their "prospects".

50.     Upon information and belief, "Inking" refers to tattooing members of the EXECUTIONERS with a skeleton with Nazi imagery, holding an AK-47.  Deputies involved in fatal shootings commonly have "inking parties" whereby an "ink chasing" deputy will get "inked" as a reward having shown members they are worthy of being a member.

51.     Upon information and belief, "Prospects" of the EXECUTIONERS are those who are "chasing ink" who will seek out calls from inked members who run dispatch of person with a gun, are encouraged to commit wrongdoings to curry favor with the "shot caller"; use the "ghost gun tactic"; and prospects are motivated to "get the gun" at whatever cost.

52.     Upon information and belief, of the approximate 100 patrol deputies at Compton Station, approximately 20 are inked members and another 20 are "prospects" or "chasing ink" and associates of the gang.

53.     Upon information and belief, the EXECUTIONERS do not allow African American or female members amongst their ranks.  Members receive more pay, preferential assignments, scheduling preference, influence station policy, and operate without fear of consequence.

54.     Upon information and belief, at the time of the incident both DEFENDANTS BARAJAS and INGERSOLL were "prospects" and after the incident became "inked", earning membership into the EXECUTIONERS, soon after the fatal shooting of DECEDENT.

### FIRST CLAIM FOR RELIEF

**Fourth Amendment—Excessive Force (42 U.S.C. § 1983)**

(Plaintiff against Defendants BARAJAS and INGERSOLL)

55.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 54 of this Complaint with the same force and effect as if fully set forth herein.

56.     DEFENDANTS BARAJAS and INGERSOLL used excessive force against DECEDENT when they intentionally fired multiple lethal force rounds, striking and killing DECEDENT.  DEFENDANTS BARAJAS and INGERSOLL'S unjustified use of deadly force, deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

57.     The sixty-five (65) year old African American DECEDENT was merely riding his bicycle home travelling south on Aranbe towards Spruce. DEFENDANTS BARAJAS and INGERSOLL closed the distance on the Escalade while on Spruce.  Then, when the pursuit reached the corner of Spruce and Aranbe, DEFENDANTS BARAJAS and INGERSOLL'S patrol

vehicle slowed to a stop when they observed DECEDENT in the area of a parked vehicle, as the Escalade continued north on Aranbe.

58.   At or around the time that the patrol vehicle came to a stop at the corner of Spruce and Aranbe, DEFENDANTS BARAJAS and INGERSOLL intentionally fired their weapons at DECEDENT through the lower right side of the front windshield and the right passenger window of the patrol vehicle.

59.   DECEDENT was near a parked vehicle on the east side of Aranbe just north of the Spruce and Aranbe intersection, which is to the north and east of the DEFENDANTS position at the time when he was shot.  One bullet fired by DEFENDANTS stuck and killed DECEDENT.  DECEDENT was found lying face-down on the north lane of Aranbe next to his bicycle, with this head oriented north-northeast.

60.   The trajectory of the bullet that struck DECEDENT was south to north.  DECEDENT was shot center-mass in the torso, with a right to left, front to back, and upward trajectory.

61.   The entrance wound of the fatal bullet that struct DECEDENT was located on his left anterior abdomen, in the left upper abdominal quadrant. The entrance wound exhibits the well-established and classic configurations of an entrance wound vis: a small oval to circular perforating wound with loss of tissue and with a rim of circumferential marginal abrasions, accompanied by secondary juxta-posed external ricochet abrasions.

62.   The exit wound of the fatal bullet that struck DECEDENT was located on his left lateral chest.  The exit wound exhibited an irregular and gaping laceration with apposable margins without any rim or circumferential marginal abrasions.

63.   The gunshot wound killing DECEDENT was fired from a 9-mm caliber weapon that suffered and external ricochet and developed a high yaw

before striking DECEDENT'S body. The ricochet of an intermediary external object or surface such as glass or the ground trajected material on DECEDENT'S skin, which caused classic external ricochet-abrasions of the skin of the left upper abdominal quadrant juxta-posed to the gunshot entrance wound and aligned along the trajectory of the bullet.

64. DEFENDANTS BARAJAS and INGERSOLL collectively fired approximately eighteen (18) rounds from their 9-millimeter firearms. Eight (8) 9-mm fragments were scattered around the Spruce and Aranbe corner near where DECEDENTS were firing from, south of DECEDENT'S body.

65. DEFENDANTS BARAJAS and INGERSOLL intentionally fired with weapons every time they pulled the trigger. DEFENDANTS BARAJAS and INGERSOLL discharged their firearms at a specific target each time they pulled the trigger, including at the DECEDENT.

66. DEFENDANTS BARAJAS and INGERSOLL violated DECEDENT'S Fourth Amendment rights when they used excessive and unreasonable force against DECEDENT, firing several lethal rounds at him, and striking DECEDENT with one round, when DECEDENT was not an immediate threat of death or serious bodily injury at the time, there were other reasonable alternatives to the use of deadly force, and no verbal warning was given prior to the shots that deadly force would be used, DECEDENT was unarmed, not violent, was not a suspect to any crime, the DEFENDANTS had no information that DECEDENT had committed any crime, and DECEDENT was not attempting to evade or resist any lawful detention or arrest, did not commit a crime, and never threatened anyone either physically or verbally.

67. As a result of the foregoing, DECEDENT suffered great physical and mental pain and suffering up to the time of his death, loss of enjoyment of life, and loss of life.

68.   The conduct of DEFENDANTS BARAJAS and INGERSOLL was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT, and therefore warrants the imposition of exemplary and punitive damages as to DEFENDANTS BARAJAS and INGERSOLL, including due to their involvement with the EXECUTIONERS.

69.   The shooting was excessive and unreasonable, especially because DECEDENT posed no immediate threat of death or serious bodily injury at the time of the shooting.   Further, DEFENDANTS BARAJAS and INGERSOLL'S shooting and use of force violated their training and standard police officer training, there were other reasonable alternatives, and no verbal warning was given.

70.   As a result of their misconduct, DEFENDANTS BARAJAS and INGERSOLL are liable for DECEDENT'S injuries, either because they were integral participants in the use of excessive force, or because they failed to intervene to prevent this violation.

71.   PLAINTIFF brings this claim as successors-in-interest to the DECEDENT, and seeks survival damages, including pre-death pain and suffering, loss of life, and loss of enjoyment of life, for the violation of DECEDENT'S rights.   PLAINTIFF also seeks statutory attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Fourth Amendment—Denial of Medical Care (42 U.S.C. § 1983)

(Plaintiff against Defendants BARAJAS and INGERSOLL)

72.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 71 of this Complaint with the same force and effect as if fully set forth herein.

73.   The denial of medical care by DEFENDANTS BARAJAS and INGERSOLL deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

74.   DEFENDANTS BARAJAS and INGERSOLL failed to provide medical care and failed to call for timely medical care for DECEDENT after they used unreasonable deadly force against DECEDENT.

75.   As a result of the foregoing, DECEDENT suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, and loss of life.

76.   DEFENDANTS BARAJAS and INGERSOLL saw DECEDENT, intentionally shot DECEDENT, knew that they struck DECEDENT with a bullet from their firearms but did not call for medical attention.   Upon information and belief, DEFENDANTS BARAJAS and INGERSOLL knew that they shot DECEDENT because after shooting DECEDENT DEFENDANTS called "998" over the radio.

77.   DEFENDANTS BARAJAS and INGERSOLL knew that failure to provide timely medical treatment to DECEDENT could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing DECEDENT great bodily harm and death.

78.   The conduct of DEFENDANTS BARAJAS and INGERSOLL was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT and therefore warrants the imposition of exemplary and punitive damages as to DEFENDANTS BARAJAS and INGERSOLL, including due to their involvement with the EXECUTIONERS.

79.   As a result of their misconduct, DEFENDANTS BARAJAS and INGERSOLL are liable for DECEDENT'S injuries, either because they were integral participants in this violation, or because they failed to intervene to prevent this violation.

80.   PLAINTIFF brings this claim as successors-in-interest to DECEDENT and seeks survival damages for the violation of DECEDENT'S rights.  PLAINTIFF also seeks statutory attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

**Substantive Due Process (42 U.S.C. § 1983)**

(Plaintiff against Defendants BARAJAS and INGERSOLL)

81.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 80 of this Complaint with the same force and effect as if fully set forth herein.

82.   The Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees all persons the right to be free from unlawful state interference with their familial relations.

83.   DEFENDANTS BARAJAS and INGERSOLL intentionally shot a visibly unarmed African American man, DECEDENT, and caused his death. The Defendants BARAJAS and INGERSOLL failed to give DECEDENT a verbal warning before they used deadly force against him and took his life. DECEDENT was not an immediate threat of death or serious bodily injury to anyone at the time of the shooting.   Upon information and belief, DEFENDANTS BARAJAS and INGERSOLL knew that they shot DECEDENT because after shooting DECEDENT DEFENDANTS called "998" over the radio.

84.     The use of excessive force by DEFENDANTS BARAJAS and INGERSOLL, without any warning, including their involvement with the EXECUTIONERS and subsequent denial of medical care as alleged above, shocks the conscience, was in deliberate indifference and reckless disregard for DECEDENT'S and Plaintiff's rights, and displayed a purpose to harm DECEDENT unrelated to a legitimate law enforcement objective.  In so doing, DEFENDANTS BARAJAS and INGERSOLL'S conduct constitutes a violation of PLAINTIFF'S and DECEDENT'S Fourteenth Amendment Substantive Due Process right to be free from unlawful state interference with their familial relationship with their son and beloved family member.

85.     DEFENDANTS BARAJAS and INGERSOLL conduct was malicious, oppressive and in reckless disregard for the rights and safety of DECEDENT and PLAINTIFF and warrants the imposition of exemplary and punitive damages as to DEFENDANTS BARAJAS and INGERSOLL.

86.     As a direct result of the death of DECEDENT, PLAINTIFF has suffered the loss of DECEDENT'S love, care, comfort, society, companionship, assistance, protection, affection, moral support, financial support, and loss of services of DECEDENT.  PLAINTIFF seeks wrongful death damages under this claim.

87.     PLAINTIFF also seeks attorneys' fees pursuant to 42 U.S.C. § 1988 and costs of suit.

/ / /

/ / /

/ / /

/ / /

/ / /

## FOURTH CLAIM FOR RELIEF

### Municipal Liability – Failure to Train (42 U.S.C. § 1983)

(Plaintiff against Defendants COUNTY and VILLANUEVA)

88.    Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 87 of this Complaint with the same force and effect as if fully set forth herein.

89.    DEFENDANTS VILLANUEVA, BARAJAS and INGERSOLL acted under color of law.

90.    The acts of DEFENDANTS VILLANUEVA, BARAJAS and INGERSOLL deprived DECEDENT and PLAINTIFF of their particular rights under the United States Constitution.

91.    The training policies of DEFENDANTS COUNTY, VILLANUEVA,  and DOE SUPERVISORS were not adequate to train its deputies to handle the usual and recurring situations with which they must deal.  This includes training with respect to tactics, the use of force, including deadly force, de-escalation techniques, not waiting for sufficient assets, equipment and personnel, controlling deputy emotions and fears including inadequate "warrior training" that imbues deputies with irrational fears about every situation and encourages excessive and unreasonable force and overreacting to a situation, inappropriate "shot/don't shoot" scenarios in training that promote the use of unreasonable force, and continually assessing a situation to justify every shot fired.  In addition to failing to train deputies to safely handle obvious, recurring situations, DEFENDANTS COUNTY, VILLANUEVA, and DOE SUPERVISORS affirmatively chose a policy it knew was likely to lead to, and in fact had previously led to, deprivations of constitutional rights including unreasonable seizures in violation of the Fourth Amendment.

92.   DEFENDANTS   COUNTY,   VILLANUEVA,   and   DOE SUPERVISORS were deliberately indifferent to the obvious consequences of their failure to train their deputies adequately, including training with respect to tactics, the use of force, including deadly force, de-escalation techniques, and vehicle pursuits.

93.   The failure of DEFENDANTS COUNTY, VILLANUEVA, and DOE SUPERVISORS to provide adequate training caused the deprivation of DECEDENT and PLAINTIFF'S rights by DEFENDANTS BARAJAS and INGERSOLL; that is, DEFENDANTS' failure to train is so closely related to the deprivation of DECEDENT'S and PLAINTIFF'S rights as to be the moving force that caused the ultimate injury.

94.   On   information   and   belief,   DEFENDANTS   COUNTY, VILLANUEVA, and DOE SUPERVISORS failed to train DEFENDANTS BARAJAS and INGERSOLL properly and adequately, including training with respect to tactics, and the use of force, including vehicle pursuits, deadly force, de-escalation techniques, and the denial of medical care thereafter.

95.   DEFENDANTS   COUNTY,   VILLANUEVA,   and   DOE SUPERVISORS' failure to train includes not having training for deputies to handle the usual and recurring situations with which they must deal; not providing adequate time and resources for deputies to train, when the training does exist, so that the officers can rely on that training during use of force incidents; not enforcing the basic training standards, when they do exist, that are designed to prevent deputies from using excessive and unreasonable force; not adequately providing recurring training so that deputies do not lose necessary perishable skills, and not re-training deputies who have used force in the field.

96.    DEFENDANTS    COUNTY,    VILLANUEVA,    and    DOE SUPERVISORS have inadequate training for COUNTY deputies with regard to the following:

a)    Effective communication to enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

b)    Effective communication as a basic element of the use of force with the goal of law enforcement is to gain voluntary compliance without resorting to physical force.

c)    A law enforcement officer's responsibility to effectively communicate both in a professional demeanor and with words resulting in improved safety.

d)    The use of deadly force as the most serious decision a peace officer may ever have to make.  Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.

e)    Reverence for life as the foundation on which the use of deadly force rests.  Deadly force as always the last resort used in the direst of circumstances.  The authority to use deadly force as an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.  In the law enforcement/community partnership, the expectation that peace officers are self-disciplined and accountable.

f)    Self-control as one of a peace officer's greatest assets in dealing with a person or a situation.

g)    Unreasonable fear includes overreactions to true potential threats as well as reactions to unreal threats based on prejudice or poor application of past experience.

h)   Unreasonable fear can be responsible for inappropriate responses such as a failure to respond or responding inappropriately (using unreasonable force).

i)   Unreasonable force occurs when the type, degree, and duration of force employed was not necessary nor appropriate.

j)   The community expects that its peace officers will use only reasonable amounts of force.   Likewise, it expects that someone, including peace officers, will intervene if reasonable force is exceeded.

k)   Use of other techniques to the use of deadly force including but are not limited to de-escalation, communication, conflict resolution, defensive tactics, less-lethal force, and use of time and distance.

l)   A deputies' subjective fear of future harm alone is insufficient as an imminent threat.   An imminent threat is one that requires instant attention.

97.   Further, the following cases demonstrate a pattern and practice of the COUNTY failing to train on the use of force, the use of deadly force, and failing to provide medical treatment and/or ignoring basic care such that individual died.  These cases also show a pattern and practice of the COUNTY ratifying unjustified and unconstitutional officer involved shooting deaths:

a)   In *Hernandez, et al. v. County of Los Angeles, et al.*, Case No.: 2:16-cv-09412-JFW (SSx); the plaintiffs alleged the January 2016 use of force by deputies when they fatally shot Mr. Hernandez was excessive and unreasonable.

b)   In *K.L., et al. v. County of Los Angeles, et al.*, Case No.: 2:18-cv-04910-CBM (SK); the plaintiffs alleged was an excessive and unreasonable use of force by a deputy that resulted in the shooting death of Kenneth Lewis, Jr.

c)      In *Lopez, et al. v. County of Los Angeles, et al.*, Case No.: 2:16-cv-00098-AB (KS); the plaintiffs alleged the use of force against Mr. Lopez was excessive and unreasonable where deputies shot him multiple times, fatally wounding him.

d)      In *C.M., et al. v. County of Los Angeles, et al.*, Case No.: 2:17-cv-05135-VAP (AGRx); the plaintiffs alleged that the deputies' use of force was excessive and unreasonable when they fatally shot Mr. Bowers.

e)      In *Berry, et al. v. County of Los Angeles, et al.*, Case No.: 2:15-cv-09715-BRO (KS); the plaintiffs brought a case alleging the excessive use of force after a fatal officer-involved shooting that caused the death of John Berry on July 6, 2015.

f)      In *R.B., et al. v. County of Los Angeles, et al.*, Case No.: 2:14-cv-05207-FMO (AS); the plaintiffs alleged that the deputies' use of force was excessive and unreasonable where they shot and killed Rashawn Brown in 2013.

g)      In *Cothran v. County of Los Angeles, et al.*, Case No.: 2:21-cv-02882-DSF-KS; the plaintiffs alleged that the County agents repeatedly denied the decedent medical care resulting in his death.

h)      In *Flores v. County of Los Angeles, et al.*, Case No.: 2:19-cv-00394; in 2017 the plaintiffs alleged denial of medical care.

i)      In *Mitchell v. County of Los Angeles, et al.*, Case No.: CV-03-8421 RJK (Awx), Defendant COUNTY argued that the use of deadly force against an unarmed civilian (Robert Mitchell) by a LASD Deputy was reasonable; the jury found otherwise, returning a verdict after finding that Deputy Manes used excessive and unreasonable force when he shot an unarmed Mr. Mitchell in the back six times, killing him.

Deputy Manes was not disciplined or retrained for his use of deadly force.

j)      In *Gutierrez, et al. v. County of Los Angeles, et al.*, Case No.: CV-10-7608 PSG (AJWx), a jury found that LASD Deputy David Salazar used excessive and unreasonable force when he shot and killed Efrain Gutierrez and awarded Mr. Gutierrez' family damages.  Deputy Salazar was not disciplined or retrained for his use of deadly force.

k)      In *Beets v. County of Los Angeles, et al.*, Case No.: KC 057667 a jury determined that the use of deadly force by the defendant LASD deputy was excessive and unreasonable under the circumstances and returned a verdict in favor of the plaintiff.

l)      In *Jacobo, et al. v. County of Los Angeles, et al.*, Case No.: CV-11-7212 GW (SSx), in 2009, LASD Deputy Mat Taylor shot and killed Ezequiel Jacobo, who was unarmed.  Deputy Taylor was not disciplined or retrained for shooting Mr. Jacobo.

m)      In *Lobrono, et al. v. County of Los Angeles, et al.*, Case No.: CV 13-03838, in 2013, LASD Deputy Ray Huang shot Michael Lobrono, who was unarmed.  Deputy Huang was not disciplined or retrained for his use of deadly force.

n)      In *Sanchez v. County of Los Angeles, et al.*, Case No.: CV 13-03836, in 2013, LASD Deputy Christopher Gomez shot Chalino Sanchez, who was unarmed and riding his bicycle at the time of the shooting.  Deputy Gomez was not disciplined or retrained for his use of deadly force.

o)      In *N.K.A., et al. v. County of Los Angeles, et al.*, Case No.: CV 13-05507, in 2013, LASD Deputy Luis Mendoza shot and killed Rigoberto Arceo, who was unarmed and had his hands up at the time of

the shooting.  Deputy Mendoza was not disciplined or retrained for his use of deadly force.

p)  In *D.A.B., et al. v. County of Los Angeles, et al.*, Case No.: CV 14-05207 FMO (ASx), in 2013, in the City of Compton, LASD Deputies Dru Strong and Gregory Rodriguez shot and killed Rashawn Brown, who, according to percipient witnesses, was unarmed at the time he was shot.  Deputies Strong and Rodriguez were not disciplined or retrained for their use of deadly force.

q)  In *Martinez v. County of Los Angeles, et al.*, Case No.: 2:14-cv-05456-DSF-MAN, LASD Deputy Cuauhtemoc Gonzalez discharged his weapon at a moving vehicle, striking Gonzalo Martinez, who was an unarmed backseat passenger.  Deputy Gonzalez was not disciplined or retrained for his use of deadly force.

r)  In *Perez., et al. v. County of Los Angeles, et al.*, Case No.: 2:15-cv-09585-SJO-FFM, Deputy Espinosa shot and killed Tony C.M., who was unarmed at the time of the shooting.  On information and belief, Deputy Espinosa as not disciplined or retrained for his use of deadly force.

s)  In *Amaya, et al., v. County of Los Angeles, et al.*, case number VC062384, on information and belief, deputies working for the Los Angeles County sheriff's department shot and killed Emiliano Amaya, with shots to Mr. Amaya's back.  On information and belief, the deputies were not disciplined or retrained for their use of deadly force.

t)  In *Calvin Newburn v. Los Angeles County Board of Supervisors, et al.*, Case No.: 2:18-CV-09692, plaintiff alleged excessive force and unreasonable search and seizure by two LASD deputies.

u)     In *Estate of Ricardo Cendejas, et al. v. County of Los Angeles, et al.*, Case No.: 2:18-CV-09560, plaintiffs alleged wrongful death and civil rights violations arising out of a fatal Deputy-involved shooting.

v)     In *Twyman, et al. v. County of Los Angeles, et al.*, Case No.: 2:20-CV-00789, plaintiffs alleged wrongful death arises out of a fatal Deputy-involved shooting.

98.    By reason of the aforementioned acts and omissions, PLAINTIFF have suffered loss of the love, companionship, affection, comfort, care, society, training, guidance, and past and future support of DECEDENT.  The aforementioned acts and omissions also caused DECEDENT'S pain and suffering, loss of enjoyment of life, and loss of life.

99.    Accordingly, DEFENDANTS COUNTY, VILLANUEVA, and DOE SUPERVISORS each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

100.   PLAINTIFF brings this claim individually and as successors-in-interest to DECEDENT and seek survival damages.  PLAINTIFF also seeks statutory attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF

**Municipal Liability – Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

(Plaintiff against Defendants COUNTY and VILLANUEVA)

101.   Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 100 of this Complaint with the same force and effect as if fully set forth herein.

102.   DEFENDANTS VILLANUEVA, BARAJAS and INGERSOLL acted under color of law.

103. The acts of DEFENDANTS VILLANUEVA, BARAJAS and INGERSOLL deprived DECEDENT and PLAINTIFF of their particular rights under the United States Constitution.

104. DEFENDANTS BARAJAS and INGERSOLL acted pursuant to an expressly adopted official policy or a longstanding practice or custom of DEFENDANTS COUNTY, VILLANUEVA, and DOE SUPERVISORS.

105. On information and belief, DEFENDANTS BARAJAS and INGERSOLL were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with DECEDENT'S death.

106. DEFENDANTS COUNTY, VILLANUEVA, DOE SUPERVISORS, BARAJAS and INGERSOLL, maintained, inter alia, the following unconstitutional customs, practices, and policies, which in the alternative were directed, encouraged, allowed, and/or ratified by the policy making officials for DEFENDANT COUNTY, including DEFENDANT VILLANUEVA:

a)   Using and tolerating excessive or unreasonable force, including excessive deadly force.

b)   Using and tolerating the LASD deputy harassment of families who have reported post fatal use of force incidents.

c)   Using and tolerating unreasonable tactics and procedures during vehicle pursuits.

d)   Escalating and tolerating escalation of incidents, as opposed to de-escalation of incidents.

e)   Exhibiting and tolerating racial animus.

f)   Providing inadequate training and policies, including sustainment training, enforcement of the training when it does exist, and

re-training, regarding the use of force, the use of deadly force, vehicle pursuits, and de-escalation.

g)     Tolerating false statements made by deputies regarding incidents, concealment of material information, and failing to complete and inaccurately completing police reports.

h)     Tolerating and failing to properly investigate excessive or unreasonable force incidents.

i)     Tolerating and encouraging deputy gangs involved in criminal activity and violations of civil rights.

j)     Failing to facilitate body-worn camera and vehicle cameras, which would reduce the number of citizen complaints as well as excessive and unreasonable force, increase social justice, primarily by assuring that individuals encountering law enforcement are treated with greater dignity and respect, and exoneration of the innocent.

k)     Tolerating and encouraging deputies to give false and misleading reports and statements in an effort to attain wrongful criminal convictions and avoid civil liability.

l)     Intimidating and/or coaching witnesses to give false information and/or to bolster deputy stories.

m)     Tolerating and failing to adequately investigate and discipline unconstitutional and unlawful deputy activity, including the proliferation of deputy "gangs" within the DEFENDANT COUNTY.  As far back as 1971, a secret subgroup called the "Little Devils" existed at the East Los Angeles station; the Citizens' Commission on Jail Violence found a long history of deputy cliques contributing to acts of insubordination, aggressive behavior, and excessive force.

n)    Employing and retaining as deputies, individuals such as DEFENDANTS BARAJAS and INGERSOLL, who DEFENDANTS COUNTY and VILLANUEVA at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force.

o)    Inadequately supervising, training, controlling, assigning, and disciplining COUNTY deputies, and other personnel, including DEFENDANTS BARAJAS and INGERSOLL, who DEFENDANTS COUNTY and VILLANUEVA knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits.

p)    Maintaining grossly inadequate and biased procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct and training deficiencies exhibited by COUNTY deputies, DEFENDANTS BARAJAS and INGERSOLL.

q)    Ratifying unconstitutional conduct and failing to adequately discipline COUNTY deputies, including DEFENDANTS BARAJAS and INGERSOLL, and DOE OFFICERS, for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct.

r)    Announcing that unjustified shootings are "within policy," including shootings that were later determined in court to be unconstitutional.

s)    Even where shootings are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the deputies involved.

t)    Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simply "code of silence," pursuant to which deputies do not report other deputies' errors, misconduct, or crimes.  Pursuant to this code of silence, if questioned about an incident of misconduct involving another deputy, while following the code, the deputy being questioned will claim ignorance of the other officers' wrongdoing.

u)    Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police shootings, including by failing to discipline, retrain, investigate, terminate, and recommend officers for criminal prosecution who participate in shootings of mentally ill individuals.

v)    Upon information and belief, COUNTY, including but not limited to LASD, have an unofficial policy, practice and/or custom of finding almost all—if not all—of its deputy involved shootings to be within policy, of not disciplining its deputies involved in shootings, or not retraining or firing deputies involved in shootings, and of not recommending criminal charges against their deputies involved in excessive and unreasonable deputy-involved shootings.  As a result, deputies involved in excessive uses of deadly force are allowed back to patrol the streets even though COUNTY and VILLANUEVA knew, or should have known, that these deputies have a propensity for using excessive deadly force against the citizens that the officers are supposed

to protect and serve, especially against minorities and in underprivileged neighborhoods.

w)     Upon information and belief, this policy, custom and/or practice long lasting and persistent, and existed well before DECEDENT was killed by the DEFENDANT DEPUTIES.  This policy, custom and/or practice was established so that COUNTY deputies do not bear the responsibility for the people that they use excessive deadly force against.  This policy, custom and/or practice exists so that the public does not have such a negative perception of COUNTY and its Sheriff's Department and so that COUNTY can avoid the repercussions associated with its deputies' use of excessive deadly force against citizens, including negative publicity, avoiding criminal prosecution and avoiding civil liability.  A significant reason that this policy, custom and/or practice was established was to avoid COUNTY being liable, under a theory of vicarious liability, for the uses of excessive and unreasonable deadly force by its employees.  In other words, there is a large financial incentive for COUNTY to erroneously determine that most, if not all, of its officers' uses of deadly force are within policy.  If COUNTY, through its policymakers and supervisors, would admit that their officers were at fault for using excessive and unreasonable deadly force, then COUNTY is well aware of how much they would have to pay for any associated litigation.

x)     The LASD has a longstanding history involving unauthorized gang-like deputy cliques, violent cliques, tattoo groups, station groups, secret deputy sub-groups, and secret societies, whose membership is based on ethnicity, involvement in excessive uses of force, intimidation of fellow deputies, and harassment and even

shootings of civilians.  Many of these groups are known for their identical, hidden, sinister tattoos, and have been the subjects of investigations, lawsuits and settlements involving excessive uses of force, violence and dishonesty.

107.  By reason of the aforementioned acts and omissions, PLAINTIFF has suffered loss of love, companionship, affection, comfort, care, society, training, guidance, and past and future support of DECEDENT.  The aforementioned acts and omissions also caused DECEDENT'S pain and suffering, loss of enjoyment of life, and death.

108. DEFENDANTS COUNTY, VILLANUEVA, and DOE SUPERVISORS, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these DEFENDANTS condoned, tolerated and through actions and inactions thereby ratified such policies.  Said DEFENDANTS also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of DECEDENT, PLAINTIFF, and other individuals similarly situated.

109.  By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, DOES 8-10 acted with intentional, reckless, and callous disregard for the life of DECEDENT and for DECEDENT'S and PLAINTIFF'S constitutional rights.  Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by DEFENDANTS COUNTY and DOES 8-10 were affirmatively linked to and were a significantly influential force behind the injuries of DECEDENT and PLAINTIFF.

110.  Further, the following cases demonstrate a pattern and practice of the COUNTY and VILLANUEVA maintaining unconstitutional customs regarding the use of force, the use of deadly force, and for practices and policies, including an unconstitutional custom and policy of failing to provide medical treatment and/or ignoring basic care such that the individual died:

a)  In *Hernandez, et al. v. County of Los Angeles, et al.*, Case No.: 2:16-cv-09412-JFW (SSx); the plaintiffs alleged the January 2016 use of force by deputies when they fatally shot Mr. Hernandez was excessive and unreasonable.

b)  In *K.L., et al. v. County of Los Angeles, et al.*, Case No.: 2:18-cv-04910-CBM (SK); the plaintiffs alleged was an excessive and unreasonable use of force by a deputy that resulted in the shooting death of Kenneth Lewis, Jr.

c)  In *Lopez, et al. v. County of Los Angeles, et al.*, Case No.: 2:16-cv-00098-AB (KS); the plaintiffs alleged the use of force against Mr. Lopez was excessive and unreasonable where deputies shot him multiple times, fatally wounding him.

d)  In *C.M., et al. v. County of Los Angeles, et al.*, Case No.: 2:17-cv-05135-VAP (AGRx); the plaintiffs alleged that the deputies' use of force was excessive and unreasonable when they fatally shot Mr. Bowers.

e)  In *Berry, et al. v. County of Los Angeles, et al.*, Case No.: 2:15-cv-09715-BRO (KS); the plaintiffs brought a case alleging the excessive use of force after a fatal officer-involved shooting that caused the death of John Berry on July 6, 2015.

f)  In *R.B., et al. v. County of Los Angeles, et al.*, Case No.: 2:14-cv-05207-FMO (AS); the plaintiffs alleged that the deputies' use

of force was excessive and unreasonable where they shot and killed Rashawn Brown in 2013.

g)      In *Cothran v. County of Los Angeles, et al.*, Case No.: 2:21-cv-02882-DSF-KS; the plaintiffs alleged that the County agents repeatedly denied the decedent medical care resulting in his death.

h)      In *Flores v. County of Los Angeles, et al.*, Case No.: 2:19-cv-00394; in 2017 the plaintiffs alleged denial of medical care.

i)      In *Mitchell v. County of Los Angeles, et al.*, Case No.: CV-03-8421 RJK (Awx), Defendant COUNTY argued that the use of deadly force against an unarmed civilian (Robert Mitchell) by a LASD Deputy was reasonable; the jury found otherwise, returning a verdict after finding that Deputy Manes used excessive and unreasonable force when he shot an unarmed Mr. Mitchell in the back six times, killing him. Deputy Manes was not disciplined or retrained for his use of deadly force.

j)      In *Gutierrez, et al. v. County of Los Angeles, et al.*, Case No.: CV-10-7608 PSG (AJWx), a jury found that LASD Deputy David Salazar used excessive and unreasonable force when he shot and killed Efrain Gutierrez and awarded Mr. Gutierrez' family damages.  Deputy Salazar was not disciplined or retrained for his use of deadly force.

k)      In *Beets v. County of Los Angeles, et al.*, Case No.: KC 057667 a jury determined that the use of deadly force by the defendant LASD deputy was excessive and unreasonable under the circumstances and returned a verdict in favor of the plaintiff.

l)      In *Jacobo, et al. v. County of Los Angeles, et al.*, Case No.: CV-11-7212 GW (SSx), in 2009, LASD Deputy Mat Taylor shot and

killed Ezequiel Jacobo, who was unarmed.  Deputy Taylor was not disciplined or retrained for shooting Mr. Jacobo.

m)    In *Lobrono, et al. v. County of Los Angeles, et al.*, Case No.: CV 13-03838, in 2013, LASD Deputy Ray Huang shot Michael Lobrono, who was unarmed.  Deputy Huang was not disciplined or retrained for his use of deadly force.

n)    In *Sanchez v. County of Los Angeles, et al.*, Case No.: CV 13-03836, in 2013, LASD Deputy Christopher Gomez shot Chalino Sanchez, who was unarmed and riding his bicycle at the time of the shooting.  Deputy Gomez was not disciplined or retrained for his use of deadly force.

o)    In *N.K.A., et al. v. County of Los Angeles, et al.*, Case No.: CV 13-05507, in 2013, LASD Deputy Luis Mendoza shot and killed Rigoberto Arceo, who was unarmed and had his hands up at the time of the shooting.  Deputy Mendoza was not disciplined or retrained for his use of deadly force.

p)    In *D.A.B., et al. v. County of Los Angeles, et al.*, Case No.: CV 14-05207 FMO (ASx), in 2013, in the City of Compton, LASD Deputies Dru Strong and Gregory Rodriguez shot and killed Rashawn Brown, who, according to percipient witnesses, was unarmed at the time he was shot.  Deputies Strong and Rodriguez were not disciplined or retrained for their use of deadly force.

q)    In *Martinez v. County of Los Angeles, et al.*, Case No.: 2:14-cv-05456-DSF-MAN, LASD Deputy Cuauhtemoc Gonzalez discharged his weapon at a moving vehicle, striking Gonzalo Martinez, who was an unarmed backseat passenger.  Deputy Gonzalez was not disciplined or retrained for his use of deadly force.

r)      In *Perez., et al. v. County of Los Angeles, et al.,* Case No.: 2:15-cv-09585-SJO-FFM, Deputy Espinosa shot and killed Tony C.M., who was unarmed at the time of the shooting. On information and belief, Deputy Espinosa as not disciplined or retrained for his use of deadly force.

s)      In *Amaya, et al., v. County of Los Angeles, et al.,* case number VC062384, on information and belief, deputies working for the Los Angeles County sheriff's department shot and killed Emiliano Amaya, with shots to Mr. Amaya's back. On information and belief, the deputies were not disciplined or retrained for their use of deadly force.

111.  Accordingly, DEFENDANTS COUNTY, VILLANUEVA, and DOES 8-10 each are liable to PLAINTIFF for compensatory damages under 42 U.S.C. § 1983.

112.  PLAINTIFF brings this claim individually and as successors-in-interest to DECEDENT and seek survival damages. PLAINTIFF also seeks statutory attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

### Municipal Liability – Ratification (42 U.S.C. § 1983)

(By Plaintiff against COUNTY and VILLANUEVA)

113.  PLAINTIFF repeats and re-alleges each and every allegation in paragraphs 1 through 112 of this Complaint with the same force and effect as if fully set forth herein.

114.  DEFENDANTS VILLANUEVA, BARAJAS and INGERSOLL acted under color of law and in the course and scope of their employment as law enforcement officers for the COUNTY.

115. The acts of DEFENDANTS VILLANUEVA, BARAJAS and INGERSOLL deprived PLAINTIFF and DECEDENT of their particular rights under the United States Constitution.

116. Upon information and belief, a final policymaker, acting under color of law, has a history of ratifying unreasonable uses of force, including deadly force.

117. Upon information and belief, a final policymaker, including DEFENDANT VILLANUEVA, acting under color of law, who had final policymaking authority concerning the acts of DEFENDANT DEPUTIES ratified the DEFENDANT DEPUTIES' acts and the bases for them. Upon information and belief, the final policymaker knew of and specifically approved of DEFENDANT DEPUTIES' acts.

118. On information and belief, COUNTY final policymakers, including DEFENDANTS VILLANUEVA and DOES 8-10, inclusive, knew that DECEDENT was not an immediate threat of death or serious bodily injury to any person at the time of the DEFENDANT DEPUTIES' use of deadly force.

119. On information and belief, the written policies with respect to the incident are that deputies are not to use deadly force against an individual unless the individual poses an immediate risk of death or serious bodily injury to the deputies or others, or if the individual has inflicted death or serious bodily injury against someone or threatened to do so, the deputies may use deadly force to prevent the individual's escape. The deputies' actions deviated from these written policies because DECEDENT did not pose an immediate threat of death or serious bodily injury to the involved officers or anyone.

120. On information and belief, the COUNTY approved of the DEFENDANT DEPUTIES' actions after a hearing presented by the deputies'

legal counsel to VILLANUEVA and DOES 8-10, inclusive, after which VILLANUEVA and DOES 8-10, inclusive, found the DEFENDANT DEPUTIES' actions to be within the official policies of the COUNTY.  On information and belief, the basis for such approval was based on the DEFENDANT DEPUTIES' self-serving statements, despite evidence to the contrary, including evidence that DEFENDANT DEPUTIES' shot and killed DECEDENT despite the fact that DECEDENT was not a threat or any kind, to anyone at the time the excessive force was used, reasonable alternatives were available, no warning was given, and DECEDENT was not a suspect to any crime.

121.   Upon information and belief, a final policymaker has determined that the acts of DEFENDANT OFFICERS were "within policy" and consistent with deputy training.

122.   By reason of the aforementioned acts and omissions, DECEDENT suffered past and future pain and suffering, loss of enjoyment of life, and loss of life.

123.   Accordingly, DEFENDANTS COUNTY, VILLANUEVA, and DOES 8-10, inclusive, are liable to PLAINTIFF for compensatory damages under 42 U.S.C. § 1983.

124.   PLAINTIFF brings this claim and seek survival damages, including but not limited to pre-death pain and suffering, loss of life, and loss of enjoyment of life.  PLAINTIFF also seeks attorneys' fees and costs under this claim.

/ / /

/ / /

/ / /

CASE No.: 2:21-cv-05209

PLAINTIFF'S COMPLAINT FOR DAMAGES

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF requests entry of judgment in her favor against DEFENDANTS COUNTY OF LOS ANGELES, SHERIFF ALEX VILLANUEVA, DEPUTIES EDWIN BARAJAS and TAYLOR INGERSOLL, and DOES 1-10, inclusive, as follows:

1.   For compensatory damages according to proof at trial.

2.   Survival damages, and wrongful death damages.

3.   For punitive and exemplary damages against the individual defendants in an amount to be proven at trial.

4.   For statutory damages.

5.   For reasonable attorneys' fees including litigation expenses.

6.   For costs of suit and interest incurred herein.

7.   For such other and further relief as the Court may deem just and proper.

DATED:  June 25, 2021                    **LAW OFFICES OF DALE K. GALIPO**


By: ___/s/___ *Dale K. Galipo*
Dale K. Galipo
Marcel F. Sincich
*Attorney for Plaintiff*

1

## **DEMAND FOR JURY TRIAL**

2

PLAINTIFF hereby submits this demand that this action be tried in front of

3

a jury.

4

5

DATED:  June 25, 2021                **LAW OFFICES OF DALE K. GALIPO**

6

7

By: _/s/     Dale K. Galipo_

8

Dale K. Galipo

Marcel F. Sincich

9

*Attorney for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28